This appeal challenges the sufficiency of evidence of fraud in a business transaction. Plaintiffs invested in a business venture, allegedly in reliance upon false representations by defendants. William M. and Kathleen P. Sherrard sued American Pioneer Life Insurance Company and Charles R. Joachim for damages and for cancellation of a mortgage and note they had executed in favor of American Pioneer. American Pioneer counterclaimed for the amount due on the note secured by the mortgage.
At the close of all the evidence at trial, the court ordered that the mortgage be cancelled. The jury awarded $100,000 in *Page 289 
damages against American Pioneer and $50,000 against Joachim. The jury also found in favor of the Sherrards on the counterclaim.
The Sherrards moved from California to Montgomery, Alabama, in 1979. Mr. Sherrard held several jobs as a salesman for various insurance companies for short periods of time. In March 1980, he met Gene Smith, the local manager for Family Life Insurance Company. Sherrard worked for Family Life from March until May of 1980. In the fall of that year, Sherrard began helping Smith with a project Smith was developing.
Smith had an idea for a combined annuity/mortgage protection policy. He initially had John Eardley, a former employee of Family Life and of American Pioneer, working with him to develop the policy. Sherrard's initial participation was merely to help Smith with typing and editing the paperwork for the project, which Sherrard testified he did not understand.
Eardley introduced Smith to Grant C. Hunt, the president of American Pioneer, and Charles R. Joachim, American Pioneer's senior vice president in charge of marketing. In late October or early November, the four men met at the Montgomery airport to discuss the possibility of American Pioneer's underwriting the policy. On November 6, Joachim wrote Smith that American Pioneer would develop the mortgage protection life insurance policy and annuity described by Smith. The letter concluded, "Gene, it will take 45 to 60 days to finalize this product and then walk it through the Alabama Insurance Department for State approval, therefore, your earliest response regarding the acceptability of this product is of the utmost importance.
In December, Smith told Sherrard that Eardley had left the project. Sherrard expressed an interest in investing in the project. Smith told Sherrard about American Pioneer's involvement and apparently showed him the letter mentioned above. They telephoned American Pioneer and talked initially to Joachim. Joachim told Sherrard that American Pioneer was very excited about Smith's policy idea. Sherrard testified:
 "They had discussed it already at a meeting at the airport here in Montgomery, Mr. Hunt and Mr. Joachim and Mr. Smith, I guess, in October or early November. And they told — Mr. Joachim professed to me that he believed that Mr. Smith's project was going to revolutionize the industry, it was the greatest thing he had seen, and absolutely his number one priority. And they wanted to expedite this project because it was so very remarkable and they were planning on hitting the streets, or shooting to hit the streets, by the first of May. And Mr. Hunt was on the phone. I got to speak with him. He was the president of American Pioneer Life, and I was greatly impressed. Here is a president with a large insurance company. I was definitely impressed. And he said Mr. Joachim was the senior vice president and a certified life underwriter, and used all kinds of enthusiasm for the program."
Sherrard borrowed $5,000 from his mother in January 1981 and invested it in the enterprise, borrowed $10,000 secured by a second mortgage on his home in March and invested it, borrowed another $5,000 from his mother in April and invested it, and invested $1,800 of his own money in June. In March Smith and Sherrard formed a corporation called Mortgage Cancellation Associates (MCA) through which to sell the policy.
During this period, Joachim sent Smith's ideas for the policy to an actuarial firm, which prepared the necessary figures for premiums and benefits. The actuary who worked on the policy wrote Joachim on February 11 that "we have developed the above new [mortgage protection] policy to be used by American Pioneer." He sent American Pioneer the final actuarial work on the mortgage protection policy on March 5th, and on a later-requested spouse's and children's rider on April 22nd.
During March and April, a computer programmer was working in Smith's Birmingham *Page 290 
office to develop a program for printing sales presentation charts about the policy. He testified that Joachim said that American Pioneer would have the policy ready by May 1, and that he was asked to finish the program by that time.
At Joachim's suggestion, Sherrard moved to Birmingham in May to be able to work on the project full time. In June the policy was not yet approved by the Alabama Department of Insurance. Sherrard testified that in late May or early June, Hunt and Joachim wanted MCA to begin a sales training program "to have something to show [American Pioneer's] board of directors by July." American Pioneer loaned MCA $25,000 for operating expenses and took a third mortgage on the Sherrards' home to secure the debt. Sherrard testified that when he expressed reluctance to put this mortgage on his home, Joachim told him,
 "Bill, this collateral thing is just something I have to show the people down here in Florida. It is merely a formality. We are not in the real estate business and we are not in any way looking to you for payment on this loan. . . . We will be looking to MCA for the payments on the loan."
Sherrard further testified that he would not have executed the mortgage but for these statements by Joachim.
MCA conducted the sales training program, but the Alabama Department of Insurance did not give final approval of the policy until August 17. Joachim came to MCA's office in Birmingham about that time. He refused to talk to Smith, but told Sherrard to call a stockholders' meeting. At that meeting, according to Sherrard, Joachim said that MCA's "problems in selling were because of Gene Smith and his inability to work with anybody." When it became clear that Joachim would not work with him, Smith left the meeting.
Joachim told Sherrard to have the locks changed so Smith could not have access to MCA's office, and that he would come back to Birmingham the following Monday "to take over and help get this thing on the road." Joachim did not return the following Monday. About two weeks later he passed through Birmingham and told Sherrard that American Pioneer could no longer do business with Gene Smith. Joachim said American Pioneer would send someone from Florida to take over the operation, but no one ever came.
Only two policies were ever sold, and one was cancelled within a few weeks. Sherrard moved back to Montgomery in September 1981 and did no further work with MCA. In February 1982, Hunt wrote the Sherrards requesting payment on the note, which had come due in January.
The Sherrards sued American Pioneer and Joachim for the allegedly fraudulent statements that the policy would be available on May 1, 1981, and that American Pioneer would not attempt to collect the loan from them personally. American Pioneer and Joachim argue that these statements did not amount to fraud.
To be actionable fraud, a statement must misrepresent a material fact and the defrauded party must act upon it to his damage. Code 1975, §§ 6-5-100 and -101; Earnest v.Pritchett-Moore, Inc., 401 So.2d 752 (Ala. 1981); Pugh v.Kaiser Aluminum Chemical Sales, Inc., 369 So.2d 796 (Ala. 1979).
A representation regarding acts or events to take place in the future constitutes fraud only if, at the time of making the statement, the party intends to deceive and not to perform the acts promised. Army Aviation Ctr. Fed. Cred. Union v. Poston,460 So.2d 139 (Ala. 1984); Purcell Co. v. Spriggs Enterprises,Inc., 431 So.2d 515 (Ala. 1983); Clanton v. Bains Oil Co.,417 So.2d 149 (Ala. 1981); Walker v. Woodall, 288 Ala. 510,262 So.2d 756 (1972).
Joachim's statements that the policy could be ready in 45-60 days or by May 1 fit within this rule. While Sherrard introduced evidence that the estimate of 45-60 days for final preparation and approval was unrealistically optimistic, there was no proof that Joachim made this statement to deceive Smith or anyone to whom Smith *Page 291 
might show the letter. Joachim wrote the letter in the initial stages of the negotiations. It shows on its face that Joachim made the time estimate to encourage Smith to respond promptly to American Pioneer's terms for developing the policy, not to tell investors when they might begin realizing a return. Any reliance by Sherrard for the latter purpose would have been unreasonable. Joachim wrote this statement on November 6, 1980. Sherrard made his initial investment in January 1981 and made further investments in March, April, May, and June. This sequence negates any reasonable inference that the Sherrards relied on the statement in the letter in making their investments.
Nor did the evidence have any tendency to prove that Joachim made any misrepresentation when he told Smith and Sherrard that the policy would be ready by May 1. Indeed, the evidence only showed that American Pioneer did its part to prepare the policy and secure approval. Hunt testified that American Pioneer spent $45,000-$60,000 in developing the policy package. This included preparing the information for the actuary, paying the actuary, reviewing the policy as returned by the actuary, sending the policy to the Florida and Alabama insurance departments for tentative approval, and printing the policy in order to receive final approval.
The actuary's letters in February and March show that Joachim had reasonable grounds for setting a May 1st goal. The fact that delays prevented the approval of the policy until August is not proof that Joachim committed fraud in setting the earlier goals. The proof showed, for instance, that Smith caused a delay in securing approval in American Pioneer's home state of Florida, a necessary prerequisite to approval in Alabama. After Florida approved the policy, Joachim hand-delivered it to the Alabama Department of Insurance, which gave preliminary and then final approval within a few weeks.
The other alleged fraud, that Joachim promised Sherrard that American Pioneer would not hold him personally liable for the note and mortgage, fails of proof for similar reasons. There was no proof that Joachim intended at the time to pursue the Sherrards rather than MCA for payment on the note. The parties were actively working at the time to make MCA a success and expected to repay American Pioneer from profits generated by MCA. Joachim left American Pioneer in November 1981, partly because he was responsible for increasing policy sales and the MCA project did not produce the amount of new business he had expected. His departure came well before Hunt attempted to collect the note in February 1982.
The Sherrards were personally liable on the note and they knowingly executed a mortgage on their house. An attorney working with MCA in Birmingham drafted both of these instruments. The Sherrards were entering a business venture for which they knew or should have known they were taking risks. These circumstances effectively undercut any assertion of reasonable reliance on any statements by Joachim contrary to the terms of the documents.
The Sherrards argue in their brief that other statements by Joachim support their claim of fraud: that Smith's idea was the greatest thing Joachim had seen, that it was American Pioneer's number one priority, and that it would revolutionize the industry. These statements are mere puffery and will not support a claim of fraud. Harrell v. Dodson, 398 So.2d 272
(Ala. 1981).
For the reasons stated, the trial court erred in denying American Pioneer's and Joachim's motions for directed verdicts and in canceling the mortgage. The judgment is reversed and the cause remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and FAULKNER, EMBRY and ADAMS, JJ., concur. *Page 292