This appeal arises from a summary judgment for counter-defendant bank on a counterclaim seeking damages for fraud. SouthTrust Bank of Mobile sued McIntyre Electric Service, Inc., (McIntyre Electric) and D.E. McIntyre for sums due on various *Page 1044 
notes. McIntyre Electric and McIntyre counterclaimed, alleging that SouthTrust, through its agent Rick L. Chastain, misrepresented that it would "stand behind McIntyre financially in order that McIntyre Electric might reach financial stability." The counterclaim alleges that SouthTrust's actions of May 20, 1983, in calling in its loans, asking McIntyre Electric's debtors to make payments to SouthTrust, and setting off the amounts in McIntyre Electric's account against its debt to SouthTrust, demonstrate the falsity of SouthTrust's assurances that it would assist McIntyre Electric financially.
The court also granted summary judgment for SouthTrust on its complaint. McIntyre Electric and McIntyre did not appeal from that judgment, however, so no issue regarding it is before us.
McIntyre Electric used the banking services of, and borrowed money from, SouthTrust for eight or nine years prior to the events giving rise to this lawsuit. In 1980 and 1981, McIntyre Electric experienced financial difficulties, which led to a large balance due SouthTrust in the summer of 1982. McIntyre Electric's debt to SouthTrust was $206,436.85 on August 30, 1982; $204,015.33 at the end of September; and $149,651.89 about the end of October. On October 29, 1982, McIntyre Electric executed a 180-day note for $90,000.00, and apparently a 30-day note for either $40,000.00 or $49,000.00. The latter note is not in the record, but SouthTrust argues that the two notes reflect part of a transaction by which McIntyre Electric's debt was reduced to $130,000.00. The materials submitted on the summary judgment motion leave an ambiguity as to whether the 30-day note was for $40,000.00 or $49,000.00, and do not give any clear indication that a payment was made to reduce the balance from $149,651.89 to $130,000. McIntyre, by affidavit, stated that the debt was $149,651.89 at the end of October and $144,127.42 at the end of November.
The amount due at this period is significant with respect to McIntyre Electric's debt on May 20, 1983, when Chastain cancelled McIntyre Electric's credit. Notes totalling $331,859.38 were due before or shortly after May 20, 1983. McIntyre stated in his affidavit that Chastain's own calculations showed the net amount due SouthTrust was $148,468.21. It does appear that SouthTrust's collection of sums due to McIntyre Electric reduced the debt to this amount. McIntyre and McIntyre Electric allege that, contrary to Chastain's assertion that he cancelled the credit because McIntyre Electric owed more after SouthTrust attempted to help McIntyre Electric improve its financial position than it did before, McIntyre Electric owed SouthTrust approximately the same amount but had improved its business prospects by paying past due payroll taxes and accounts payable which McIntyre Electric had owed in October 1982. The counterclaim alleges that Chastain's abrupt cancellation of the credit demonstrates the falsity of the earlier representations that SouthTrust would aid McIntyre in regaining financial stability.
McIntyre and Chastain engaged in discussions in the fall of 1982 as to whether McIntyre Electric should stop operating or continue in business. McIntyre Electric had an opportunity to bid for a large electrical subcontract with Payne Keller Gulf Coast, Inc., on a job for which Payne Keller was the general contractor. Chastain, McIntyre, and a representative of Payne 
Keller met over lunch sometime in November, at which time it was agreed that SouthTrust would continue to extend credit to McIntyre Electric so McIntyre could bid on the contract and attempt to improve its financial position. McIntyre Electric was awarded the Payne Keller subcontract. It began performance of its work under the subcontract in December 1982 and finished in May 1983.
Each week during the performance of the subcontract, McIntyre would take the records of McIntyre Electric's payroll, payroll taxes, and office expenses to Chastain, whereupon Chastain would lend McIntyre Electric the money to cover the expenses. Loans were made in this manner on April *Page 1045 
15, 21, and 29, and May 6, 12, and 17. A loan of $173,253.09 made on May 2 reflects a renewal or consolidation of prior loans. The May 17 loan was for $8,084.90 and the proceeds were deposited into McIntyre Electric's checking account.
On May 19, Chastain went to McIntyre Electric's office, as he stated in his deposition, "to do an audit of the receivables." His testimony continued:
 "I picked up the last two invoices to Payne Keller. After coming back to the bank, establishing what loans had been advanced during the project and the monies that were going to be coming due out of the project, it appeared that the bank would not be able to obtain all of the monies back out advanced. It was at that point in time that we contacted legal counsel as to the best way to protect the bank's interest."
On the following day, Chastain mailed a letter to McIntyre demanding payment on all loans and transfer of the accounts receivable and other assets which McIntyre Electric had pledged as security for the loans. He also mailed letters to the businesses for which McIntyre Electric had done work on which payment was still due, requesting that the payments be made directly to SouthTrust, as assignee of McIntyre Electric's interest. Chastain also placed a hold on McIntyre Electric's checking account, appropriating the sums therein as a set-off against McIntyre Electric's debt to SouthTrust.
Counterplaintiffs argue that Chastain made misrepresentations when he promised to support McIntyre Electric financially during the negotiations on the Payne Keller project and when he approved the loan on May 17, the proceeds of which he later withdrew from McIntyre Electric's checking account. For a promise to perform an act in the future to constitute fraud, there must be an intent not to perform the promise at the time it is made. American Pioneer Life Ins. Co. v. Sherrard,477 So.2d 287 (Ala. 1985); Evans v. Adam's Rib, Inc., 289 Ala. 377,267 So.2d 448 (1972); Nelson v. Darling Shop of Birmingham,Inc., 275 Ala. 598, 157 So.2d 23 (1963); Nelson Realty Co. v.Darling Shop of Birmingham, Inc., 267 Ala. 301, 101 So.2d 78
(1957).
Neither of the alleged misrepresentations constitutes an actionable fraud. Chastain in fact performed the promise of supporting McIntyre Electric through the performance of the Payne Keller subcontract. No promise to support McIntyre Electric for an indefinite period can be inferred from the facts presented here. McIntyre Electric originally expected to make $22,000.00 profit on this job. After change orders and additional work, McIntyre Electric in fact made $37,000.00 profit. Even under the tendencies of the evidence most favorable to counterplaintiffs, the debt to SouthTrust had not been significantly reduced during the duration of the contract. Chastain decided to terminate McIntyre Electric's credit at the end of the Payne Keller contract, not the beginning.
The counterclaim alleges that the approval of the expenses on May 17, the execution of the loan to cover those expenses, and the depositing of the proceeds of the loan into the checking account constituted a representation that the sums would not be withdrawn to be used as a set-off against McIntyre Electric's debt. Given the number and amount of past due notes evidencing McIntyre Electric's indebtedness, Chastain's act of continuing the prior course of business cannot be held to imply a promise that no later action would be taken to call in the loans and protect SouthTrust's secured interests. The fact that he discovered the net effect of the Payne Keller project two days later tends to show that he decided to cancel McIntyre Electric's credit on the later date and refutes the claim that he intended not to leave the May 17 deposit in the account at the time he approved the loan.
McIntyre and McIntyre Electric also argue that the circumstances gave rise to a fiduciary relationship between them and SouthTrust, and that they indicate a fraudulent concealment arising from Chastain's failure to disclose his intention to take the *Page 1046 
actions he did. The facts submitted show only a debtor-creditor relationship. SouthTrust had no control or influence over McIntyre Electric's business except by asserting its rights as creditor.
In short, Chastain did only what SouthTrust was entitled to do under the terms of the credit agreements with McIntyre Electric. The materials submitted in opposition to the motion for summary judgment do not show any misrepresentation that would support the counterclaim. The judgment is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and HOUSTON, JJ., concur.