[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 667 
On March 1, 1999, Armstrong Business Services, Inc. ("ABS"), and its owner, Norris Armstrong, sued AmSouth Bank and Leonard "Bo" Marks, an AmSouth employee, alleging tort and contract claims arising out of failed negotiations between AmSouth and ABS concerning a $5.2-million loan request. The complaint contained the following counts: (count one) breach of contract; (count two) misrepresentation; (count three) fraudulent nondisclosure; (count four) deceit; (count five) intentional interference with business relations; (count six) negligence; (count seven) wantonness; and (count eight) negligent or wanton hiring, retention, and supervision of employees. AmSouth and Marks filed answers on April 30, 1999, generally denying the allegations of wrongdoing alleged in the counts and interposing various defenses.
On May 2, 2000, after extensive discovery by the parties, AmSouth and Marks filed a joint motion for a summary judgment as to the individual claims of Armstrong, arguing that he lacked standing, and a joint motion for a summary judgment as to the claims asserted by ABS. *Page 668 
Both motions were supported by a memorandum of law, attached evidentiary materials, and a list of supporting cases. On June 19, 2000, ABS filed a motion and a brief in opposition to AmSouth and Marks's motions for summary judgment, conceding that Marks and AmSouth were entitled to a summary judgment as to count two, claiming misrepresentation; count four, claiming deceit; and count five, claiming intentional interference with business relations. ABS and Armstrong also conceded that Armstrong lacked standing to assert ABS's claims. Also on June 19, ABS filed a motion styled "Plaintiffs' Notice of Filing of Evidentiary Materials in Opposition to Defendants' Motions for Summary Judgment." Attached to this motion were numerous items.[1]
On June 22, 2000, the trial court held a hearing and heard arguments on Marks and AmSouth's motions. On June 29, 2000, ABS filed a supplemental notice of evidentiary materials offered in opposition to the defendants' motion for summary judgment, to which notice several more items were attached.[2] Also on June 29, ABS filed a "letter brief" in response to the trial court's questions asked at the hearing. In response, Marks and AmSouth filed a "letter brief" on July 3. On July 11, Marks and AmSouth moved to strike the affidavits of Morrison, Conwell, and Hasty, on the ground that under Rule 56(c)(2) they were untimely as not having been filed at least two days before the hearing.
On August 8, 2000, the trial court entered an order granting AmSouth and Marks's motions for summary judgment. In pertinent part, the order stated:
 "This action is based on a `loan commitment letter' and is before the Court on Defendants' motions for summary judgment. Count one claims breach of contract by the Defendant Bank. The Court finds that the contract, if indeed there is a contract, runs afoul of the requirement of the Statute of Frauds that the consideration for loan commitments be expressed in writing. `If the consideration be not expressed in the writing, the agreement does not bind.' Rains v. Patton, 191 Ala. 349, [351], 62 So.2d 600 (1914).
 "Count three claims breach of a duty of the Bank to disclose the facts that the Bank took the positions that the alleged agreement did not constitute an absolute commitment to loan, that it did not intend to honor the alleged commitment and that the Bank officer in question was without authority to make the alleged commitment. There is no fiduciary relationship between the parties and the Court finds that the circumstances *Page 669 
of this case give rise to no such duty to disclose.
 "Counts six and seven allege negligent and wanton breach of duties claimed to be assumed by the Bank in connection with the alleged commitment. The Court finds that no duty devolved on the Bank outside the confines of the alleged agreement. See Cahaba Seafood [, Inc.]v. Central Bank of the South, 567 So.2d 1304
(Ala. 1990).
 "Finally, it is claimed [in count eight] that the damages complained of were occasioned by the Bank's negligent supervision of its officer. This claim is not supported by the evidence submitted.
 "The other claims having been conceded by Plaintiffs, and there being no genuine issue as to any material fact, judgment is entered for Defendants, the parties to bear their own costs.
"Done at Mobile, this 8th day of August 2000."
(R. 3815-16.)
On August 22, 2000, ABS and Armstrong filed a motion to alter, amend, or vacate the summary judgment. The trial court, on August 29, 2000, entered what it called a "supplemental summary-judgment order"; we understand that August 22 order to be an order amending the summary judgment entered on August 8, 2000. By that amendment, the trial judge (1) made it clear that the summary judgment was not based on a conclusion that as to their various theories of recovery Armstrong and ABS had failed to present substantial evidence on the element of damage and (2) acknowledged that AmSouth, in the summary-judgment proceedings, had stipulated that the plaintiffs had substantial evidence on the element of damage, but that AmSouth had made that stipulation without prejudice to its right, should there be a trial or future motions, to argue that the plaintiffs had incurred no damage. The amendment also stated that the court had denied the July 11 motion by AmSouth and Marks to strike the affidavits of Morrison, Conwell, and Hasty, and that "those affidavits are part of the record which was before the Court [when it considered] the merits of the Defendants' summary-judgment motions."
On September 11, 2000, ABS appealed from the summary judgment. ABS argues that the trial court erred in entering the summary judgment as to its claims alleging (1) breach of contract (count one); (2) fraudulent nondisclosure or suppression (count three); (3) negligent or wanton refusal to lend money (counts six and seven); and (4) negligent and wanton supervision (count eight). Armstrong did not appeal.
 The Facts
ABS owns and operates several HR Block franchises, which provide tax-return-preparation services to the public. ABS acquired its franchises in 1989; they are located in Mobile, Baldwin, Washington, and Clark Counties, all in South Alabama. In late 1997, ABS became aware that other HR Block franchises were to become available for purchase in Northwest Florida and in Escambia and Monroe Counties in Alabama. These franchises were operated collectively under the corporate name "Thriftax." The Thriftax franchises had been owned and operated by David B. Clayton, who had died in 1977. Clayton's will provided that they be held in trust for 20 years and then be sold through a bidding process. The Thriftax franchises were attractive to ABS for purchase because their proximity to the franchises ABS already owned would allow for a less costly accommodation with ABS's management and marketing plans. ABS, represented by Armstrong, subsequently entered into negotiations with the Clayton Estate trustees, and it acquired option rights to purchase the franchises by *Page 670 
matching the highest bids on them from other prospective purchasers. Those prospective purchasers included HR Block, which was seeking to reacquire its franchises. After obtaining the options, ABS sought financing for the purchase of the Thriftax franchises, from a number of banks and investors other than AmSouth; in each case, ABS was unwilling or unable to agree to the prospective lender's terms.
In early September 1997, ABS, acting through Armstrong, contacted AmSouth, hoping to negotiate a loan for the purpose of purchasing the Thriftax franchises. ABS had a banking relationship with AmSouth, having maintained certain corporate accounts with AmSouth, dating back to 1980; ABS had similar relationships with several other banks. Armstrong testified that his first contact with AmSouth regarding purchasing the Thriftax franchises was with AmSouth employees Mike Cadden and Bo Marks, at ABS's offices, on October 22, 1997. Marks was a loan officer (termed a "relationship manager" by AmSouth), and Cadden was a loan officer who had worked on earlier transactions with ABS. Armstrong testified that he told Marks he needed a loan of approximately $5 million and that he wanted terms by which ABS would repay the loan over a 15-year period, paying only interest for the first 2 years, and after that paying principal and interest, using the newly acquired franchises as collateral.
After the October 22, 1997, meeting, Armstrong dealt only with Marks, usually in a personal meeting at the local AmSouth branch, but also by telephone. At their next meeting, the date of which is not specified in the record, Marks questioned Armstrong about whether the franchise rights were assignable in the event ABS defaulted and AmSouth assumed possession of the franchises under the terms of the proposed loan. Marks then asked Armstrong to obtain a letter from HR Block stating that it would consent to the assignment of the franchise rights. Armstrong indicated that he was unwilling to seek such a letter because he was currently bidding against HR Block for the Thriftax franchises and he did not wish to reveal his position to HR Block. Armstrong testified on deposition that he understood that the assignability of the Thriftax franchises was critical to the question whether he would receive financing from AmSouth. Armstrong never attempted to obtain HR Block's consent to an assignment of the Thriftax franchises.
During the next two weeks, Armstrong and Marks met a few more times to discuss the possibility of AmSouth's providing financing for the purchase of the Thriftax franchises. Armstrong testified that ABS provided AmSouth with large quantities of its business records, including tax returns, profit-and-loss statements, and other financial statements, for the purposes of complying with AmSouth's procedures for approving the kind of loan ABS was seeking. Armstrong stated that he not only provided AmSouth financial data concerning the HR Block franchises ABS owned, but also provided financial information concerning the operation and performance of the Thriftax HR Block franchises ABS was attempting to purchase. Armstrong testified that AmSouth collected and analyzed the financial data and that Marks made an oral commitment on behalf of AmSouth to loan ABS up to $5.2 million on the following terms: an interest rate between 8.75 and 9.25%, but not to exceed 9.25%; a 14-year term for repayment, with a balloon payment in 3 to 5 years; and with the Thriftax franchises to be pledged as collateral, if necessary. On November 10, 1997, Marks sent an internal memorandum to AmSouth's chief *Page 671 
credit officer at the time, Michael Willoughby, describing the proposed terms of the loan sought by ABS:
"To: Michael Willoughby
"From: Bo Marks /s/ Marks
"cc: Tom Papa Mike Phebus
"Date: November 10, 1997
 "Subject: Armstrong Business Services, Inc. $5.1 MM term loan request
 "Borrower: Armstrong Business Services, Inc. d/b/a HR Block (Norris Armstrong) Since 1989
 "Amount: $3,800,000 Pensacola District $1,300,000 Okaloosa District
"Loan Type: Term 3 year Maturity 14 year Amort.
"Repayment: Annual principal and interest ($665M)
"Rate: 9.25% fixed
 "Purpose: To finance purchase of HR Block Franchise districts in markets contiguous to his current district (Mobile Baldwin Counties)
 "Collateral: Assignment of Franchise Rights to the following franchises:
 "Mobile Baldwin District $1,700,000 x 1.14 = $1,938,000
"Pensacola District $2,155,000 x 1.14 = $2,456,000
"Okaloosa District $ 735,000 x 1.14 = $ 837,000
"Total $5,231,000[3]
 "Guarantor: Norris Armstrong wife PFS 10/97 Outside Assets — $3,629M Outside Worth — $1,391M Credit — Clean
"Key Man Life
"Insurance: I/A/O $2.5MM term"
At approximately the same time, Armstrong asked Marks for a letter expressing AmSouth's interest in making the loan, so that he could satisfy the attorneys for the Clayton Estate that ABS would be able to obtain the financing needed to enable it to acquire the Thriftax franchises. On November 14, 1997, Marks sent Armstrong a letter, which stated in pertinent part:
"Dear Mr. Armstrong:
 "AmSouth Bank is pleased to inform you that Armstrong Business Services, Inc. (ABS Inc.) has qualified for term financing of up to $5,200,000 for the purpose of acquiring certain HR Block franchise rights in the counties of Escambia and Okaloosa, Florida. Based on your application and the subsequent financial and industry information provided to us, we feel comfortable with intended source of repayment and proposed collateral. However, please be advised that the bank's commitment to fund a loan will be subject to our ability to secure the debt with an effective and perfected assignment of the franchise rights of ABS, Inc.'s existing franchise territories and the franchise territories being purchased with any loan proceeds. The assignment must be acceptable to bank counsel and other interested parties and be effective to allow the bank to foreclose upon and resale [sic] the franchise rights. The specific term and conditions of the intended loan would be outlined in a commitment letter which will be subject to formal credit approval."
It is undisputed that ABS paid AmSouth no fee for this letter. Armstrong testified that he believed the November 14, 1997, letter was a letter of commitment by AmSouth to finance the purchase of the Thriftax franchises, confirming his oral discussions and agreements with Marks. Marks testified that he advised Armstrong, before sending the letter, that the letter was not a commitment letter, but only a letter of interest. Marks also testified that there was never an agreement as to the financing and that he came to believe that the loan could not be obtained because ABS would not obtain the rights to assign the Thriftax franchises. Marks had no authority to bind AmSouth to a $5.2-million loan. Armstrong testified that he had been assured by Marks that the proposed loan to ABS was a good deal and that AmSouth could provide it.
On November 22, 1997, Armstrong sent the attorneys for the Clayton Estate a *Page 672 
letter agreeing to acquire the HR Block franchises in Northwest Florida for the total amount of $5,153,367. The Clayton Estate asked for, and received, a copy of AmSouth's letter of November 14, 1997, as an indication of ABS's ability to pay the purchase price. Armstrong testified that sometime between November 25 and 29 he provided AmSouth with a copy of ABS's letter of November 22, 1997, wherein ABS agreed to match the high bid and to purchase the Thriftax franchises. Pursuant to the terms of Armstrong's agreement with the Clayton Estate, a down payment of 10% of the purchase price was due on or before January 23, 1998.
On January 7, 1998, Armstrong telephoned Marks for an update as to when the loan documents would be ready to be signed. Marks informed Armstrong that AmSouth would not fund the loan request for $5.2 million because AmSouth had determined that the HR Block franchises would be insufficient collateral and that it had no evidence that the franchise rights could be assigned. Although it is undisputed that the parties understood that the assignability of the Thriftax franchises was critical to the availability of financing, the record shows considerable disagreement as to the nature of the franchises to be used as collateral. As indicated in Marks's memorandum quoted above, AmSouth anticipated that collateral for the loan would include all of the HR Block franchises ABS already owned and also the Thriftax franchises, and that ABS would obtain the rights necessary to ensure that those franchises would be freely assignable. Armstrong testified that he believed that only the Thriftax franchises were to be collateral. He did not attempt to obtain any confirmation of the assignability of any of the franchises. Similarly, AmSouth expected the loan for the Thriftax franchises to be personally guaranteed by Armstrong and his wife; Armstrong stated that he did not intend that he or his wife would sign personal guarantees, but that he would have considered signing such guarantees in order to get the loan. Although ABS sought other financing to fund its purchase of the Thriftax franchises, it was unsuccessful, and it was never able to purchase the Thriftax franchises.
The record also includes portions of AmSouth's "Commercial Loan Policy Manual" that discuss procedures for processing loans, and it contains the deposition testimony of Jerry Morrison, designated by ABS as an expert in banking. Morrison testified that the duties of a loan officer include submitting a loan request to the approving authority in order to obtain the appropriate approval to fund the loan. The record also contains testimony by Tom Papa, Marks's supervisor, who had authority to approve the loan. Papa testified generally that AmSouth would have made the loan if ABS had met AmSouth's terms and conditions for the loan.
Armstrong also testified that, although he believed AmSouth would make the loan to ABS so that it could acquire the Thriftax franchises, he thought ABS was never obligated to accept any loan from AmSouth. The record shows that after AmSouth had refused to make the $5.2-million loan to ABS for the purchase, ABS borrowed $381,000 from AmSouth to use as a deposit on its options to purchase the Thriftax franchises. ABS later sold those options to HR Block for a profit of approximately $200,000.
 Standard of Review
The standard by which this Court reviews a motion for summary judgment is well established:
 "The principles of law applicable to a motion for summary judgment are well settled. To grant such a motion, the trial court must determine that the *Page 673 
 evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala.R.Civ.P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmovant to present `substantial evidence' creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989); § 12-21-12(d)[,] Ala. Code 1975. Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).
 "In our review of a summary judgment, we apply the same standard as the trial court. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala. 1997). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Ex parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 184 (Ala. 1999).
 I. Breach of Contract
ABS first argues that the trial court erred in entering the summary judgment as to the count alleging breach of contract. The trial court ruled that "the contract, if indeed there is a contract, . . . runs afoul of the . . . Statute of Frauds." ABS argues that the evidence before the court created genuine issues of material fact as to the existence of a loan agreement, as to whether the agreement was breached, and as to whether the agreement violated the Statute of Frauds. The elements of a breach-of-contract claim are: (1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance; (3) the defendant's nonperformance, or breach, and (4) damage. Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 975 (Ala. 1998). The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement. Hargrove v. Tree of Life Christian Day Care Ctr.,699 So.2d 1242, 1247 (Ala. 1997), citing Pinyan v. Community Bank,644 So.2d 919 (Ala. 1994).
Because the trial court, in entering the summary judgment as to the breach-of-contract claim, specifically stated that it was relying on the Statute of Frauds, we begin by considering that Statute. The applicable portions of Alabama's Statute of Frauds, Ala. Code 1975, § 8-9-2, state:
 "In the following cases, every agreement is void
unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
". . . .
 "(7) Every agreement or commitment to lend money, delay or forebear [sic] repayment thereof, or to modify the provisions of such an agreement or commitment. . . ."
(Emphasis added.)
The trial court concluded that no writing or memorandum before the court expressed a consideration for a commitment by AmSouth to lend ABS $5.2 million, so that under the Statute of Frauds any agreement to that effect claimed by ABS would be void. The term "loan commitment" is defined as follows:
 "A lender's binding promise to a borrower to lend a specified amount of money at a certain interest rate, usu. within a *Page 674 
 specified period and for a specified purpose (such as buying real estate)."
Black's Law Dictionary at 948 (West 7th ed. 1999). This definition fromBlack's also references the term "mortgage commitment." Black's defines "commitment fee":
 "An amount paid to a lender by a potential borrower for the lender's promise to lend money at a stipulated rate and within a specified time. Commitment fees are common in real estate transactions. See LOAN COMMITMENT."
Id. at 266. Generally, when a loan commitment is determined to be an enforceable contract, it is treated as an option purchased by the prospective borrower. See Peterson Dev. Co. v. Torrey Pines Bank,233 Cal.App.3d 103, 284 Cal.Rptr. 367 (Cal.App. 4 Dist. 1991); CapitalHolding Corp. v. Octagon Dev. Co., 757 S.W.2d 202 (Ky.App. 1988); andAnalytical Design Constr. Group, Inc. v. Murray, 690 P.2d 269
(Colo.App. 1984). Alabama has no caselaw exactly on this point, but the definition and concept of a "loan commitment," as explained in Black's
and in the cases just cited, fit exactly with the general law in this state governing option contracts. See, e.g., Jenkins v. Thrift,469 So.2d 1278 (Ala. 1985); Kennedy v. Herring, 270 Ala. 73, 116 So.2d 596
(1959).
This Court has directly addressed the consideration requirement of the Statute of Frauds in the context of option contracts, in Foy v. Foy,484 So.2d 439 (Ala. 1986). In Foy, the Court considered one family member's attempt to compel another family member to specifically perform an option contract allowing the first to purchase certain real estate from the other. In its legal analysis, the Court emphasized the requirement of the Statute of Frauds that the option agreement itself contain a statement of the consideration:
 "We agree with the trial court's finding that the option contract here, which falls within the Statute [of Frauds], see Griese-[Traylor] Corp. v. First National Bank of Birmingham, 572 F.2d 1039 (5th Cir. 1978), contained no statement in writing expressing the consideration for the option itself. The option recites:
 "`KNOW ALL MEN BY THESE PRESENTS, That we, R.E. Foy, Jr. and Jane Loring Foy, do covenant and agree with R.E. Foy, Sr. and wife, Ruth N. Foy, of Dothan, Houston County, Alabama, that if the said R.E. Foy, Sr. or Ruth N. Foy will tender, or cause to be tendered, to us, the said R.E. Foy, Jr. and Jane Loring Foy, at any time during their lifetime the sum of $18,637.50, we will grant, bargain, sell and convey to the said R.E. Foy, Sr. or Ruth N. Foy, with full covenants of warranty, the following property, to-wit: . . .'
 "Clearly, this option contract contains no statement of any consideration for the option itself. The monetary figure expressed, $18,637.50, refers not to the option contract but to the consideration to be paid in the future for the deed of the land to be purchased. That transaction has nothing to do with the unilateral option contract. For the distinction, see McGuire v. Andre, 259 Ala. 109, 65 So.2d 185 (1953). As stated generally in 77 Am.Jur.2d Vendor and Purchaser § 34 (1975) at 214:
 "`The consideration for the option is a thing apart from the consideration for the sale of the land. There must be some consideration on which the finger may be placed and of which it may be said, "this was given by the proposed purchaser to the proposed vendor, as the price for the option, or privilege to purchase." . . .' *Page 675 
 "See also Rains v. Patton, 191 Ala. 349, 67 So. 600
(1914) (`If the consideration be not expressed in the writing, the agreement does not bind'). The trial court's conclusion, therefore, was correct under the authorities."
484 So.2d at 442-43.
Accordingly, we must determine whether one of the writings in this record, specifically AmSouth's internal memorandum of November 10; the November 14 AmSouth letter; or the November 22 letter from ABS to the Clayton Estate, contains an expression of consideration for an agreement by AmSouth to lend money to ABS. We make this determination in light of this Court's discussion of consideration in Ex parte Grant, 711 So.2d 464,465 (Ala. 1997):
 "`A test of good consideration for a contract is whether the promisee at the instance of the promisor has done, forborne or undertaken to do anything real, or whether he has suffered any detriment, or whether in return for the promise he has done something he was not bound to do, or has promised to do some act or to abstain from doing something.'
 "Roberts v. Lindsey, 242 Ala. 522, 525, 7 So.2d 82, 84
(1942); Russell v. Russell, 270 Ala. 662, 668, 120 So.2d 733, 738 (1960). `[T]o constitute consideration for a promise, there must have been an act, a forbearance, a detriment, or a destruction of a legal right, or a return promise, bargained for and given in exchange for the promise.' Smoyer v. Birmingham Area Chamber of Commerce, 517 So.2d 585, 587 (Ala. 1987)."
(Emphasis added.) See also Kelsoe v. International Wood Prods., Inc.,588 So.2d 877 (Ala. 1991). Although none of the three writings noted above contains an explicit reference to consideration that would fit within the Grant definition, ABS argues strongly that these writings can be construed together to make the requisite showing.
First, ABS contends that the November 10, 1997, memorandum from Marks shows consideration because, ABS says, the memorandum states a proposed interest rate and amortization schedule for the loan. However, this memorandum creates a situation somewhat like that in Foy; to the extent it shows consideration at all, it shows consideration for the proposed loan contract — the memorandum shows no consideration from ABS to AmSouth for a commitment to lend money. ABS also contends that the November 14, 1997, letter shows consideration because that letter, in discussing the assignment of ABS's franchise rights, refers to security for the proposed loan. Again, however, this argument shows consideration only for the proposed loan — it does not show consideration for a loan commitment.
ABS also argues that its November 22, 1997, letter to Thriftax agreeing to purchase the HR Block franchises constituted consideration. In support of this argument, ABS asserts that its agreement with the Clayton Estate to purchase the Thriftax franchises constitutes consideration for the loan commitment from AmSouth. ABS relies on the discussion quoted above from Grant to argue that its obligation to the Clayton Estate was consideration to AmSouth because it had "undertaken to do [something] real." However, nothing in the November 22, 1997, letter indicates that AmSouth had received any benefit by ABS's issuing that letter, nor is there any indication that AmSouth executed, or was involved in the execution of, the letter.[4] *Page 676 
ABS's argument concerning the November 22, 1997, letter wholly disregards the requirement in the discussion of consideration shown by the language emphasized from Grant, supra, that the consideration must have been undertaken or given at AmSouth's behest or given in return for AmSouth's promise to lend money. In short, we conclude that the November 22, 1997, letter to the Clayton Estate does not show, and that no other writing in the record shows, any act by ABS "bargained for and given in exchange" for a promise by AmSouth to make a $5.2-million loan.
At most, these three writings show anticipated consideration by ABS to AmSouth concerning the proposed loan. None of the three writings ABS relies on shows consideration for a loan commitment, and our careful examination of the record has located no other writing showing consideration for a contract by AmSouth to lend money to ABS. That is, the record contains no writing showing that ABS has given AmSouth anything, or has performed, or refrained from performing, any act for the benefit of AmSouth, in exchange for AmSouth's commitment to lend ABS money. Accordingly, we conclude that the trial court correctly entered the summary judgment for AmSouth on ABS's count alleging breach of contract. Foy, supra.
 II. Fraudulent Nondisclosure (Suppression)
Count three of ABS's complaint states claims against Marks and AmSouth based on allegations of fraudulent nondisclosure, or suppression. ABS argues that Marks had a duty to disclose the following information to ABS in November 1997: (1) that the Bank had in fact not agreed to lend ABS $5.2 million; (2) that the correspondence and documents of November 1997 did not constitute an agreement by the Bank to make the loan; (3) that ABS had not "qualified" for the loan; and (4) that Marks had no authority to commit the Bank to a loan of $5.2 million. The trial court held that the evidence showed "[t]here is no fiduciary relationship between the parties and . . . that the circumstances of this case give rise to no such [a] duty to disclose."
ABS argues that it presented substantial evidence as to each of the elements of its fraudulent-suppression claim. Ala. Code 1975, §6-5-102, provides:
 "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."
At the outset, we note that ABS has abandoned its claims regarding any affirmative misrepresentation by AmSouth. Its arguments concerning fraud, therefore, focus on what it alleges AmSouth should have disclosed that ABS could not otherwise have discovered. See Richard Brown Auction Real Estate, Inc. v. Brown, 583 So.2d 1313 (Ala. 1991) (holding that a plaintiff has no valid claim of suppression concerning a fact that the plaintiff could have ascertained). We first consider the question the trial court found dispositive, whether substantial evidence before the court indicated AmSouth owed ABS a duty, i.e., whether substantial evidence indicated AmSouth had an obligation to communicate. "The question whether a party had a duty to disclose is a question of law *Page 677 
to be determined by the trial court." Barnett v. Funding Plus of America,Inc., 740 So.2d 1069, 1074 (Ala. 1999), citing State Farm Fire Cas.Co. v. Owen, 729 So.2d 834 (Ala. 1998). The trial court must consider and apply the following factors in determining whether, under the particular circumstances, a duty to disclose exists: "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances."Owen, supra, 729 So.2d at 842-43.
We have already determined that there was no contract between ABS and AmSouth (their agreement, such as it was, being rendered void as a contract by the Statute of Frauds); therefore, there is no contractual basis for a duty to communicate. However, this Court has recognized that in certain limited situations a question of fact concerning a duty to disclose may arise outside a contractual relationship. See Hines v.Riverside Chevrolet-Olds, Inc., 655 So.2d 909, 919-20 (Ala. 1995),overruled on other grounds, Owen, supra. Accordingly, we consider the factors set out in Owen, outside the context of a contractual duty. In its determination that there was an extracontractual duty of disclosure, the Court in Hines began by considering whether the facts in that case showed a relationship sufficient to give rise to a duty to disclose. SeeColonial Bank v. Ridley Schweigert, 551 So.2d 390 (Ala. 1989). InHines, the Court considered suppression claims made by purchasers of automobiles manufactured by General Motors ("GM"), claims alleging that GM had owed the purchasers a duty to disclose that it had made repairs to the automobiles but was selling them as new. The Court's analysis considered the facts that GM had been in complete control of the manufacture of its vehicles and that the purchasers had had little or no opportunity to gain knowledge concerning the details of that manufacture. The Court noted that the undisclosed repairs made by GM were not readily ascertainable by a purchaser until long after a vehicle had been purchased. There was no possibility that a contractual relationship could give rise to a duty between GM and the purchasers in Hines, because the automobiles in question were purchased from dealers and could not be purchased directly from GM. Further, in Hines, the Court was careful to note that it was not imposing a general duty of disclosure on all automobile manufacturers. 655 So.2d at 912. Under these circumstances, the Court held that there was a question of fact concerning the duty that a large corporate manufacturer might owe its purchasers in a context where the manufacturer never directly negotiates or contracts with those purchasers.
There is no factual analogy between this case and Hines. In this case, the relationship between ABS and AmSouth is that of two corporations attempting to negotiate an agreement whereby AmSouth would lend ABS money. Unlike the parties in Hines, who were dealing with automobiles produced by GM, ABS and AmSouth were involved in face-to-face negotiations to create a financing agreement for the purchase of the Thriftax franchises, an agreement that specifically addressed their respective business interests. In addition to the factual disparity between Hines
and the instant case, we note that the Court in Hines was unwilling to extend its rationale even to other automobile manufacturers and their purchasers, much less to any situation analogous to the debtor-creditor negotiations presented in this case. In contrast, this Court has, in other suppression cases, addressed situations factually analogous to the relationship between ABS *Page 678 
and AmSouth, in considering whether a duty to communicate had arisen. "Courts have traditionally viewed the relationship between a bank and its customer as a creditor-debtor relationship which does not impose a fiduciary duty of disclosure on the bank." Baylor v. Jordan, 445 So.2d 254,256 (Ala. 1984). See also K C Dev. Corp. v. AmSouth Bank, N.A.,597 So.2d 671 (Ala. 1992), and McIntyre Elec. Serv., Inc. v. SouthTrustBank, 495 So.2d 1043 (Ala. 1986). We conclude that the rationale ofHines, arising from distinguishable facts, does not displace this general rule. Accordingly, we consider the question of an extracontractual duty in the context of negotiations between a bank and its corporate customer.
In considering the relationship between a bank and its corporate customer that is necessary to give rise to a duty to disclose, we findMcIntyre, supra, instructive. In that case, SouthTrust Bank sued McIntyre Electric to collect on various loan obligations, and McIntyre Electric counterclaimed, alleging, among other things, that the bank had fraudulently suppressed information about its collection practices. The trial court entered a summary judgment for the Bank on McIntyre Electric's counterclaim, and McIntyre Electric appealed. One of the issues presented to this Court was whether, under the facts of that case, the relationship between McIntyre Electric and SouthTrust was sufficient to impose on the bank a duty of disclosure that exceeded any contractual obligation between the parties. The facts in McIntyre were that McIntyre Electric had used SouthTrust as its lender for financing its contracting operations, in an ongoing series of loans, for approximately nine years before the dispute that gave rise to the litigation. Despite this close working relationship, the Court held:
 "The facts submitted show only a debtor-creditor relationship. SouthTrust had no control or influence over McIntyre Electric's business except by asserting its rights as creditor."
495 So.2d at 1046. Thus, this Court determined in McIntyre that, as a matter of law, the bank had had no duty to disclose. It affirmed the summary judgment.
Our examination of the applicable authority reveals no Alabama case that has found a duty to disclose, or an obligation to communicate, that has arisen between a prospective corporate borrower and a bank in circumstances analogous to those present in this case. We note that the substance of all of ABS's arguments focuses on the argued existence of a valid contract to make a loan, a contract that did not exist. Each of these arguments is undermined by evidence that was before ABS and that showed ABS did not have a finalized and enforceable contract with AmSouth for a $5.2-million loan. This evidence includes Armstrong's knowledge that the assignability of the franchises was critical to AmSouth's approval of a loan and his knowledge that he had not obtained a promise or commitment of such assignability; the language in the November 10, 1997, memorandum referring to a loan request; and the language in the November 14, 1997, letter stating that AmSouth's commitment to make the loan was contingent on ABS's obtaining the right to assign all the franchises it currently held and the franchises to be purchased, and that a commitment letter would be issued if the bank approved the security. This letter, and the November 10, 1997, memorandum, which is addressed to Marks's supervisors at AmSouth, also undermine ABS's argument that AmSouth suppressed the fact that Marks could not authorize the loan himself. In the absence of any affirmative claim that Marks misrepresented that he had authority to approve the loan, these documents indicate that Marks was *Page 679 
dependent on his supervisors at AmSouth for approval of the loan. Facts that are ascertainable by the plaintiff cannot support a claim of suppression. Owen and Brown, supra.
The instant situation is not the situation in Duckworth v. NationalBank of Commerce, 656 So.2d 340 (Ala. 1994). In that case, the plaintiffs were investors in a real estate development; they sued a bank because the bank did not disclose that a document essential to the plaintiffs' development plans contained a forged signature of one of the bank's officers. Thus, the bank in Duckworth had knowledge that the plaintiffs were being defrauded by a forger, but it made no effort to disclose that information during a time when the plaintiffs were continuing to incur debts to the bank in order to complete their development. The Court, discussing the similar case of Ryan v. First Alabama Bank, 620 So.2d 568
(Ala. 1993), held that the bank's actions were tantamount to knowingly aiding the forger in his fraud, and that the bank was under a duty not to supply such aid. Nothing in this case indicates any sort of direct fraud by a third party comparable to that in Duckworth. In fact, ABS has specifically abandoned its claims of a direct misrepresentation.
We conclude that the instant case is most appropriately governed by the rationale in McIntyre, in which this Court held that an even closer business relationship between a bank and its customer was not sufficient to give rise to a duty to disclose. Accordingly, the trial court properly held that AmSouth owed no duty of disclosure to ABS and its summary judgment, insofar as it relates to ABS's suppression claim, is due to be affirmed.
 III. Negligent or Wanton Refusal to Lend Money
Counts Six and Seven of the complaint allege negligence or wantonness by AmSouth and Marks in connection with Marks's handling of the $5.2-million loan request made by ABS. (R. 11-12.) ABS argued that Marks had negligently or wantonly failed to complete a loan-approval form and submit it to the appropriate authorities at AmSouth; that as a result of that failure ABS lost its opportunity to purchase the Thriftax franchises; and that ABS was thereby harmed. The trial court rejected this claim, holding that AmSouth had owed ABS no duty outside "the alleged loan agreement."
The elements of a negligence claim are a duty, a breach of that duty, causation, and damage. AALAR, Ltd., Inc. v. Francis, 716 So.2d 1141, 1144
(Ala. 1998). At common law, a duty of due care can accompany a contractual obligation; see Pugh v. Butler Tel. Co., 512 So.2d 1317, 1319
(Ala. 1987). In addition, a duty of due care can arise in the absence of a contract, based on "a number of factors, including public policy, social considerations, and foreseeability [of harm]." Smitherman v.McCafferty, 622 So.2d 322, 324 (Ala. 1993). "The ultimate test of the existence of a duty to use due care is found in the foreseeability that harm may result if care is not exercised." Buchanan v. Merger Enters.,Inc., 463 So.2d 121, 126 (Ala. 1984). "Due care is relative always and much depends upon the facts of the particular case." Cox v. Miller,361 So.2d 1044, 1048 (Ala. 1978).
This Court has defined "wanton conduct":
 "`[The] doing of some act or something with reckless indifference to the consequences of said act, or . . . a failure or omission to do something, with reckless indifference to the consequences of such failure or omission, that is, that the party acting or failing to act is conscious of his conduct, and even though without *Page 680 
 any actual intent to injure is aware from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property.'"
Weatherly v. Hunter, 510 So.2d 151, 152 (Ala. 1987), quoting W.T.Ratliff Co. v. Purvis, 292 Ala. 171, 291 So.2d 289 (1974).
As with the issues addressed earlier, we focus first on the trial court's rationale for entering the summary judgment for AmSouth on ABS's claims alleging negligence or wantonness. Because we have already determined that, under the circumstances of this case, AmSouth owed ABS no contractual duty to lend ABS $5.2 million, we consider whether, outside a contractual relationship, AmSouth owed ABS any duty that could support its claims of negligence or wantonness. ABS asserts that a duty apart from any contractual claim in this case consists of a duty by Marks to properly process ABS's loan request. ABS argues that such a duty is shown by AmSouth's procedures for processing loans, contained in section #100-1 of AmSouth's "Commercial Loan Policy Manual" and by the testimony of Morrison.
In support of its argument that Marks had a duty to process ABS's loan request, ABS relies on Lance, Inc. v. Ramanauskas, 731 So.2d 1204 (Ala. 1999); Collins v. Wilkerson, 679 So.2d 1100 (Ala.Civ.App. 1996); andWal-Mart Stores, Inc. v. Tuck, 671 So.2d 101 (Ala.Civ.App. 1995), all holding, ABS says, to the effect that a company's own policies, if violated, may give rise to a duty of care. In Lance, the Court considered the question of the duty a distributor of vending machines had owed to a child who was electrocuted while attempting to purchase a snack from one of its vending machines. The Court determined that the distributor's policies specifying the requirements for the safe installation of its vending machines gave rise to a duty to the child, because the distributor was aware of the danger that electrical shocks could result from the way its machines were installed and it was reasonably foreseeable that such installation could cause injury. In Collins, the Court of Civil Appeals determined that a muffler business that disregarded its policies for parking vehicles to be serviced had owed a duty to a customer who was injured when she stepped out of her car and fell off a ramp. In Tuck, the Court of Civil Appeals determined that Wal-Mart's failure to follow its policies concerning cleaning its floors supported a finding that it had owed a duty to a customer who tripped and fell over an item on the floor. In each of the cases relied upon by ABS, the duty that supported the negligence claim was a common-law duty arising from the foreseeability of physical harm resulting from the defendant's failure to follow its policies concerning the safety of the public. In Collins and Tuck, the duty of care arose from a premises-liability analysis in which the defendant's failure to maintain its business premises resulted in danger to the public, and in Lance the duty arose from the immediately foreseeable hazard to the public caused by a vending machine that was not properly electrically grounded. In addition to the fact that the duty in these three cases arose as a result of the immediate foreseeability of physical harm, these cases are unlike the instant case in that the duty the court found in them was not contingent upon whether the plaintiff was engaged in a business transaction with the defendant. That is, unlike the duty that ABS argues exists in this case, the duty owed by the defendants in Lance, Collins, and Tuck was owed to the public at large and did not arise out of contractual negotiations. *Page 681 
In response, AmSouth argues that the analysis presented by this Court in Cahaba Seafood, Inc. v. Central Bank, 567 So.2d 1304 (Ala. 1990), is more applicable. In Cahaba Seafood, the plaintiff sued Central Bank, asserting several claims, including negligence and wantonness, arising from the bank's refusal to lend money. The plaintiff also asserted a claim alleging that the bank had breached its contract to lend money under the terms of a credit-line agreement. The trial court entered a summary judgment on all of the plaintiff's claims except the breach-of-contract claim, including the negligence and wantonness claims, and the plaintiff appealed that summary judgment to this Court. This Court held that outside the credit-line contract there was no duty to lend money, and it affirmed the summary judgment as to the negligence and wantonness claims. The Court of Civil Appeals reached a similar conclusion on analogous facts in Tharp v. Union Bank, 364 So.2d 335
(Ala.Civ.App. 1978) (holding that a bank had no duty, outside the terms of a contract to lend money, to extend additional loans to a prospective borrower). See also General Motors Corp. v. Bell, 714 So.2d 268 (Ala. 1996).
We conclude that the record supplies no basis for a holding that AmSouth owed ABS a common-law duty that could support its claims of negligence or wantonness based on its loan-application policies. Unlike the policies employed by the defendants in Lance, Collins, and Tuck, all of which were policies intended to provide for public safety, the AmSouth policy that ABS references was solely for AmSouth's benefit. See Spriggsv. Compass Bank, 742 So.2d 178 (Ala.Civ.App. 1997) (holding that a bank's internal policy of notifying mortgagors of the cancellation of their property insurance was for the bank's benefit and did not imply a duty to the mortgagors). The only duty shown by the evidence regarding AmSouth's loan-application policies in this case is a duty owed by Marks to AmSouth.
The record shows only that AmSouth indicated that it would consider ABS's offer to borrow money and then failed to consider that offer to the extent that ABS contends would have been appropriate. Even viewing the facts in this case in a light most favorable to ABS, we conclude that the reasonably foreseeable outcome of Marks's completely satisfying AmSouth's loan-application procedure in regard to ABS's application would have been that AmSouth would have denied the loan, because there was no indication that the Thriftax franchises were assignable. Alabama law is long settled that a breach of a promise, outside a contract or a duty imposed by the common law, does not support a tort cause of action:
 "`There is, in Alabama, no tort liability for nonfeasance for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. On the other hand, misfeasance, or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things. . . .'
 "Morgan v. South Central Bell Tel. Co., 466 So.2d [107] at 114 [(Ala. 1985)]; see C C Products, Inc. v. Premier Ind. Corp., 290 Ala. 179, 186, 275 So.2d 124, 130 (1972), appeal after remand, sub nom. Premier Ind. Corp. v. Marlow, 292 Ala. 407, 295 So.2d 396, cert. denied, 419 U.S. 1033, 95 S.Ct. 515, 42 L.Ed.2d 308 (1974) (`a mere failure to perform a contractual obligation is not a tort, and it furnishes no foundation for an action on the case')." *Page 682 
Pugh v. Butler Tel. Co., 512 So.2d 1317, 1320 (Ala. 1987). See alsoVincent v. Blue Cross-Blue Shield of Alabama, Inc., 373 So.2d 1054 (Ala. 1979). Under the circumstances of this case, we conclude that the trial court correctly held that AmSouth had no duty to ABS that could support ABS's claims alleging negligence or wantonness. The trial court's summary judgment is therefore due to be affirmed as to these claims.
 IV. Negligent or Wanton Supervision
Last, ABS argues that the trial court erred by entering a summary judgment for AmSouth on its claim alleging negligent or wanton supervision, as set out in Count Eight of ABS's complaint. ABS argues that it presented substantial evidence creating a genuine issue of material fact as to whether AmSouth negligently or wantonly supervised Marks.
A claim of negligent supervision is stated as follows:
 "`In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.'"
Big B, Inc. v. Cottingham, 634 So.2d 999, 1003 (Ala. 1993) (quoting Lanev. Central Bank of Alabama, N.A., 425 So.2d 1098, 1100 (Ala. 1983) (quoting Thompson v. Havard, 285 Ala. 718, 725, 235 So.2d 853 (1970))). "Wanton supervision" requires that the employer wantonly disregard its agent's incompetence, under the circumstances noted in Big B where "wantonness" is as defined in section III of this opinion.
ABS argues that a genuine issue of material fact as to whether AmSouth negligently or wantonly supervised Marks is created by evidence indicating (1) that Marks was allowed to analyze the loan request from ABS and send the November 14 letter despite the fact that Marks was not authorized to lend that amount of money; (2) that Marks had never handled a loan of this size before; (3) that Marks's college major was political science, and he had no formal training in banking other than what he had received at AmSouth; (4) that Marks was not familiar with the policies of AmSouth; (5) that Marks did not tell Armstrong that the November 14 letter was a "letter of interest" only, and not an agreement to lend up to $5.2 million; (6) that Marks's November 14 letter indicates that the application for the loan would be submitted for "formal credit approval," but Marks never submitted the application; and (7) that Marks's failure to complete and submit the loan application caused damage to ABS. *Page 683 
However, the evidence offered by ABS does not constitute substantial evidence of negligent or wanton supervision. It is not sufficient merely to allege, or to show, that the employee acted incompetently. A plaintiff must establish "by affirmative proof" that the employer actually knew of the incompetence, or that the employer reasonably should have known of it. Lane v. Central Bank, 425 So.2d 1098, 1100 (Ala. 1983), quotingThompson v. Havard, 285 Ala. 718, 723, 235 So.2d 853, 858 (Ala. 1970). To carry this burden, the plaintiff may show either that he informed the employer about specific misdeeds of the employee, or that the employee's misdeeds were "of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice."Lane, 425 So.2d at 1100. This Court, in Lane, held that a borrower had failed to establish that a bank had negligently supervised a bank officer who, the borrower alleged, required that part of the borrower's loan proceeds be loaned to the officer. "Assuming Lane has been damaged by the acts of Mills, . . . he has not established that the damage occurred because of any incompetency on Mills's part for which the bank might conceivably be liable." Id. at 1100. The arguments offered by ABS amount to no more than accusations that Marks did not handle the loan request properly. ABS argues that because Marks may have made mistakes, AmSouth must have negligently or wantonly supervised him. However, these accusations do not amount to proof that AmSouth was aware of and, negligently or wantonly, disregarded acts of incompetence by Marks that damaged ABS. Lane, supra.
 Conclusion
The trial court correctly held that the Statute of Frauds renders void any purported contractual obligation by AmSouth to lend money to ABS. Moreover, the trial court also correctly held that outside a contractual obligation AmSouth owed ABS no duty that would support ABS's tort claims alleging suppression, negligence, wantonness, or negligent or wanton supervision. The summary judgment is therefore affirmed.
AFFIRMED.
Moore, C.J., and Houston, Brown, and Stuart, JJ., concur.
See, J., recuses himself.
[1] These items included: (1) Armstrong's deposition; (2) Marks's deposition; (3) the deposition of Tom Papa, former senior credit officer of AmSouth; (4) the deposition of William Seifert, city president of AmSouth Bank in Mobile; (5) the deposition of Michael Phebus, Marks's supervisor during the events on which this lawsuit was based; (6) the deposition of Michael Willoughby, current senior credit officer of AmSouth; (7) documents produced by AmSouth and Marks; (8) plaintiffs' first set of interrogatories and requests for production and defendants' answers; (9) plaintiffs' answers to defendants' interrogatories; (10) the deposition of Elizabeth Armstrong, Armstrong's wife; (11) plaintiffs' second request for production directed to defendant Marks and documents produced by Marks; (12) the affidavit of Jerry Morrison, offered as a "banking expert"; and (13) the documents produced by ABS to AmSouth and Marks.
[2] These items included: (1) another copy of the affidavit of Jerry Morrison; (2) the affidavit of William Conwell, an attorney for the Clayton Estate, the prior holders of the Thriftax franchises; and (3) the affidavit of William Hasty, Jr., offered as that of an expert on franchise rights.
[3] We recognize that the math in the memorandum is incorrect, but we have reproduced the memorandum as it appears in the record.
[4] Although it is not dispositive of our analysis of the November 22, 1997, letter as consideration, we recognize the policy of the Statute of Frauds that parties are not charged with contractual duties arising from documents they have not executed. See generally Anselmo Meat Co. v.Riley, 533 So.2d 552 (Ala. 1988); Bunch v. Garner, 208 Ala. 271, 94 So. 114
(1922); see also Restatement (Second) of the Law of Contracts § 130 (1979).